**[J-77-2019] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| RACHEL L. CARR | : | No. 3 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 380 |
| | : | MD 2017 dated June 12, 2018, |
| | : | which reversed the adjudication of |
| COMMONWEALTH OF PENNSYLVANIA, | : | the State Civil Service Commission, |
| DEPARTMENT OF TRANSPORTATION | : | entered August 1, 2017, at Appeal |
| AND COMMONWEALTH OF | : | No. 29058. |
| PENNSYLVANIA, STATE CIVIL SERVICE | : | |
| COMMISSION | : | ARGUED:  September 12, 2019 |
| | : | |
| | : | |
| APPEAL OF: PENNSYLVANIA | : | |
| DEPARTMENT OF TRANSPORTATION | : | |

## CONCURRING OPINION

**JUSTICE WECHT**                                              **DECIDED:  May 19, 2020**

In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the United States Supreme Court addressed the issue of employment consequences for speech by a public employee.  In that seminal case, voters in an Illinois district had approved a December 1961 bond issue for construction of new schools.  *Pickering*, 391 U.S. at 565.  In 1964, the Board of Education ("the Board") twice proposed associated tax increases, and the teachers' organization and superintendent both expressed support for the second of these, support that was reported in the local newspaper.  That newspaper also published a letter to the editor, authored by high school teacher Pickering, that was, "basically, an attack on the [Board's] handling of the 1961 bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. It also charged the superintendent of schools with attempting to prevent teachers . . . from

opposing or criticizing the proposed bond issue." *Id.* at 566.[1] Pickering was fired for writing and submitting the letter. The Board based its decision to fire Pickering upon its belief that the letter contained falsehoods, impugned the Board and school administrators, disrupted the school community, and caused dissension and controversy among teachers and administrators. *Id.* at 567. The Illinois state courts declined to credit Pickering's First Amendment claim, reasoning that "his acceptance of a teaching position in the public schools obliged him to refrain from making statements about the operation of the schools 'which in the absence of such position he would have an undoubted right to engage in.'" *Id.*

The Supreme Court first addressed the Illinois courts' rationale for resolving the First Amendment claim. The Court noted that it has previously rejected the premise that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Id.* at 568. However, the Court also recognized that the government has an interest as an employer in regulating the speech of its employees that differs from the government's interest in regulating the speech of the general public.

---

[1] The following are excerpts from Pickering's letter: "To illustrate further, do you know that the superintendent told the teachers, and I quote, 'Any teacher that opposes the referendum should be prepared for the consequences.'" *Pickering*, 391 U.S. at 576. "That's the kind of totalitarianism teachers live in at the high school, and your children go to school in." *Id.* at 576-77. "To sod football fields on borrowed money and then not be able to pay teachers' salaries is getting the cart before the horse." *Id.* at 577. "The taxpayers were really taken to the cleaners." *Id.* "As I see it, the bond issue is a fight between the Board of Education that is trying to push tax-supported athletics down our throats with education, and a public that has mixed emotions about both of these items . . . ." *Id.* at 578. "I must sign this letter as a citizen, taxpayer and voter, not as a teacher, since that freedom has been taken from the teachers by the administration." *Id.*

In balancing those interests, the Court looked to the letter, which it described as consisting of criticism of the allocation of funds between educational purposes and athletics and of the superintendent's efforts to prevent information about the tax increase from being made public. *Id.* at 569. The Court determined that the letter was not directed at any of Pickering's co-workers or anyone in his school, so there were no issues of disruption in the workforce or insubordination with immediate supervisors. *Id.* at 569-70. The Court rejected the idea that critical statements on issues of public importance could, standing alone, provide adequate grounds for dismissal.[2] *Id.* at 570.

The Court also noted that the topic on which the Board and Pickering disagreed — the operations of the school — was of general public interest. Because the issue was subject to a public vote, free and open debate was necessary in order to inform voters. *Id.* at 571-72. Because teachers would be the members of the community most informed about these issues, it was "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."[3] *Id.* at 572. Finally, the Court found that the statements were critical of a public employer on a matter of public interest, but did not affect the employee's performance of daily duties or the operation of the public employer. Given those circumstances, the Court concluded that the Board's interest in limiting the

---

[2]     The Court allowed that some positions may be of such confidential nature "that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism . . . would seriously undermine the effectiveness of the working relationship." *Pickering*, 391 U.S. at 570 n.3.

[3]     The Court noted that Pickering's letter erroneously reported the amount spent on athletics. However, the Board could have corrected that information. Further, the information was not "so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." *Pickering*, 391 U.S. at 572.

employee's speech was no greater than "its interest in limiting a similar contribution by any member of the general public." *Id.* at 573.

The Court recognized that free debate on matters of public importance is at the core of the right to free speech secured by the First Amendment. Therefore, had Pickering's comments been made by a non-employee, the Board would only have a cause of action when "such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity." *Id.* The Court concluded that, "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574.

The Supreme Court revisited the issue in *Connick v. Myers*, 461 U.S. 138 (1983). Summarizing the rule of *Pickering* and its progeny, the Court stated that, if the employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern . . . government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146. Consequently, a review of the context and content of a given statement is necessary to determine whether it involves a matter of public concern. *Id.* at 147-48. When the employee's speech is related to a matter of public concern, then a court must balance the employer's "interest in the effective and efficient fulfillment of its responsibilities to the public" with the employee's interest in speech. *Id.* at 150. In other words, the public employer's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Id.*

Myers was an assistant district attorney. When Myers was notified that she was being transferred to a different section within the office, she opposed the move and met with her supervisors to discuss the transfer and other issues. *Id.* at 140-41. One of the

supervisors indicated that other members of the office did not share Myers' concerns, so Myers prepared a questionnaire to survey her co-workers on issues such as transfers, office morale, grievance procedures, and pressure to work on political campaigns. Myers distributed the questionnaire to fifteen co-workers. Myers was fired for refusing to accept the transfer and for insubordination reflected in distribution of the questionnaire.[4] Myers sued, alleging that she was fired for exercising her right to free speech. *Id.* at 141.

The Court determined that the majority of the questionnaire related to internal office issues because the questions were neither designed to inform the public about the office's failure to discharge its public duties nor intended to expose wrongdoing. However, the Court concluded that the question about work on political campaigns could be construed as an issue of public concern given then-recent case law noting "that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights." *Id.* at 149.

Having found that Myers' speech touched on an issue of public concern, the Court moved on to balance the interests of Myers and the District Attorney's Office. The Court recognized that Myers' speech did not impede her ability to perform her job. However, given the employer's contention that Myers' questionnaire amounted to insubordination, the Court considered whether it interfered with working relationships. The Court held that deference should be afforded to an employer's judgment in predicting disruption in the workplace because it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is

---

[4] The questions included: "From your experience, do you feel office procedure regarding transfers has been fair?" "Do you have confidence in and would you rely on the word of: [named supervisors?]" "Do you ever feel pressured to work in political campaigns on behalf of office supported candidates?" "How would you rate office morale?" *Connick*, 461 U.S.at 155-56.

manifest before taking action." *Id.* at 152. The Court also considered that Myers' speech occurred in the workplace and arose in the context of an employment dispute. Taking all of those circumstances into account, the Court concluded that Myers' discharge was not a violation of her First Amendment rights. *Id.* at 154.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Court further clarified that a court first must determine "whether the employee spoke as a citizen on a matter of public concern." *Id.* at 418. If not, then there is no viable First Amendment claim. If the employee did speak on a matter of public concern, a court then must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* In this second inquiry, a court must balance "the individual and societal interests that are served when employees speak as citizens on matters of public concern and . . . the needs of government employers attempting to perform their important public functions." *Id.* at 420.

Ceballos was a deputy district attorney. After being alerted to potential discrepancies in an affidavit used to support a search warrant, Ceballos investigated the issue. When that investigation did not satisfy his concerns, Ceballos wrote a memo explaining the issues and recommending that the case be dismissed. *Id.* at 414. When the office moved forward with the prosecution, the defense called Ceballos to testify about his concerns at a hearing on a motion to challenge the warrant. Alleging that subsequent adverse employment consequences were retaliation for his testimony, Ceballos sued. The Court determined that Ceballos' statements were made pursuant to his duties as an assistant district attorney. Therefore, the Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

In *Sacks v. Department of Public Welfare*, 465 A.2d 981 (Pa. 1983), this Court expanded upon the balancing of interests prescribed by the second part of the *Pickering/Connick* inquiry. We explained that, once it is established that the employee's speech involves a matter of public concern, there is "a calculus of injury" that must be considered. *Id.* at 988. We identified a number of factors that must be considered, including the public importance of the employee's speech. As the public importance increases, the employer's burden to demonstrate an injury that justified disciplining an employee increases. As the public importance of the speech decreases, so too does the employer's burden. *Id.* at 988-89.

Reviewing this line of cases, it becomes clear that the first inquiry is whether the employee's speech addresses a matter of public concern. Here, Carr's original post to the closed Facebook group read as follows:

> Rant: can we acknowledge the horrible school bus drivers? I'm in PA almost on the NY border bear [*sic*] Erie and they are hella scary. Daily I get ran off the berm of our completely wide enough road and today one asked me to t-bone it. I end this rant saying I don't give a flying shit about those babies and I will gladly smash into a school bus.

Brief for Appellant at 6. As other members of the group responded to Carr's original post, Carr made these additional responsive statements:

> 0 fucks
>
> And that's my problem? They broke traffic law, which I'm abiding and I'm in the wrong  Get fucked. What world do you live in that I'd deliberate [*sic*] injure myself in stead of somebody else. Didn't call myself a hero
>
> Transportation . . . road laws. Right
>
> No I'm saying you don't care about the random fucks that drive your kids and are you serious? Haha
>
> Department of Transportation . . . that means road laws. Not worrying about your kids that are probably your cities issue

> Your children and your decision to chance them with a driver you've never been a passenger with is your problem. A vehicle pulls out in front of me or crosses the yellow line, that's their problem. A sedan, school bus or water truck. You're [*sic*] kids your problem. Not mine
>
> I care about me

*Id.* at 7. The State Civil Service Commission concluded that it was "at a complete loss to find any reasonable public interest in a rant about harming children or a bus driver. [Carr's] remarks do not provide any educational information to the public or serve to inform them about any public matter." Adjudication, 10/23/2017, at 18.[5]

The Commonwealth Court disagreed. It held that "Carr's speech touched on the safety of schoolchildren and the traveling public," which it deemed a matter of public concern. *Carr v. Pa. Dep't of Transp.*, 189 A.3d 1, 13 (Pa. Cmwlth. 2018). I would find that the Commonwealth Court erred in that holding. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Further, a court "can not 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed." *Miller v. Clinton Cty.*, 544 F.3d 542, 550 (3d Cir. 2008). That is exactly what the Commonwealth Court did here. The court overgeneralized Carr's expressions of personal frustration to find a matter of public concern. The problem with this approach is that almost any statement can be connected to a matter of public concern if viewed broadly enough. The Commonwealth Court ignored the context of the statements and method of communication, both of which reveal that Carr was not speaking on a matter of public concern, but merely venting her personal frustration.

---

[5] In case the speech had even "an inkling of public interest," the Commission went on to address the second part of the *Pickering*/*Connick* line of cases and weighed the employer's and employee's interests. Adjudication at 18. The Commission found that disruption to the workplace weighed in favor of the employer. *Id.* at 18-19.

For that reason, were I writing on a blank slate, I would reverse the Commonwealth Court upon that basis and not reach the second part of the *Pickering/Connick* inquiry. However, oddly enough, the Department of Transportation ultimately chose not to challenge the Commonwealth Court's conclusion that Carr's speech addressed a matter of public concern. Instead, the Department has elected to focus upon the second part of the *Pickering/Connick* inquiry.[6]

Because the issue I would hold to be determinative was not raised and preserved for this Court, and because the Majority ably addresses the second *Pickering/Connick* inquiry, I join the Majority's resolution of the case.

To the Majority's position, I would add that a public employee's speech on social media may raise additional concerns for a public employer. While Pickering's speech was in a local newspaper, Myer's speech was limited to the district attorney's office, and Ceballos' speech was in the district attorney's office and the courtroom, a public employee's speech on social media has the potential to be broadcast worldwide within a very short time span. *See Grutzmacher v. Howard Cty.*, 851 F.3d 332, 345 (4th Cir. 2017) ("[A] social media platform amplifies the distribution of the speaker's message — which

---

[6] In the first question this Court granted for review, the Department concedes that Carr's speech was on a matter of public concern. *See* Maj. Op. at 8 ("Is the Commonwealth Court's decision in conflict with the U.S. Supreme Court's rulings . . . which allow a government employer to terminate an employee on the basis of their speech, even when it touches upon a matter of public concern . . . ?"). The Department's second question concerns whether Carr's speech involved a matter of public importance. *See id.* ("Did the Commonwealth Court err as a matter of law by failing to give sufficient weight to the public importance, or lack thereof, of Carr's Facebook comments, as required by *Pickering* and its progeny?"). Public importance is relevant to the factors identified in *Sacks*, to be considered in the second part of the *Pickering/Connick* inquiry. *See id.* at 16, 22-23. As the Majority details, the Department only argues public importance in the context of balancing the employer's and employee's interests. *See id.* at 15-17. Therefore, the Department has waived the question of whether Carr's speech actually touched upon a matter of public concern (the first part of the *Pickering/Connick* inquiry).

favors the employee's free speech interest — but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency.") (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016)). The breadth and speed of transmission is not necessarily within the employee's control. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 462-63 (3d Cir. 2015) (case in which a teacher's blog posts that were critical of student resulted in the school district receiving requests from over 200 parents who did not want their children in the teacher's class and the story of the blog posts was covered by major news networks and national press). As this case demonstrates, social media commentary, even posted during non-working hours, is not immune to adverse employment consequences. Rather than posting without consideration of consequences, public employees should give deliberate thought to their social media use, and public employers should provide clear guidelines in this regard.

Justice Dougherty joins this concurring opinion.