[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14676

_____

AJ O'LAUGHLIN,
CRYSTAL LITTLE,

                                        Plaintiffs-Appellants,

*versus*

PALM BEACH COUNTY,
a political Subdivision of the State of Florida,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cv-80701-WPD

_____

Before NEWSOM, MARCUS, Circuit Judges, and STORY, District Judge.[*]

NEWSOM, Circuit Judge:

Pursuant to its Social Media Policy, the Palm Beach County Fire Rescue Department disciplined firefighters AJ O'Laughlin and Crystal Little for an exchange they had on an invitation-only Facebook page associated with O'Laughlin's campaign for the presidency of the local firefighters' union. In particular, O'Laughlin and Little accused union officials of conspiring with Fire Department management to misuse member-donated paid time off. We must decide whether, by punishing O'Laughlin and Little, the County violated their First Amendment rights to free speech and free association.

The district court dismissed O'Laughlin and Little's as-applied free-speech and free-association claims on the pleadings, and subsequently granted summary judgment for the County on their claims that the Social Media Policy was unconstitutionally overbroad and vague on its face. After careful review, we affirm the district court's judgment as to the free-association and vagueness claims but vacate and remand as to the free-speech and overbreadth claims.

---

[*] Honorable Richard W. Story, United States District Judge for the Northern District of Georgia, sitting by designation.

# I

## A

O'Laughlin and Little—to whom we will sometimes refer collectively as "plaintiffs"—are both captains in the Palm Beach County Fire Rescue Department. Importantly for present purposes, both are also members of the International Association of Firefighters Local 2928—which, for brevity's sake, we'll simply call "the union."

At the time of the incident underlying this case, O'Laughlin was running for the union presidency. As part of his campaign, he created an invitation-only Facebook page, on which he posted a comment accusing the union's First Executive Vice President— Captain Jeffrey Newsome—of attempting to misuse, for his personal benefit, time that union members had donated to the Union Time Pool. The UTP consists of union-member-donated hours that union officers can use on days that they would otherwise have to take off from their regular work in order to conduct union business. O'Laughlin's Facebook post accused Newsome of conspiring with Fire Department management to use donated UTP time on Thanksgiving and Christmas Days—on which, all agree, he wouldn't have been transacting any union business. O'Laughlin posted a screenshot of the UTP calendar and stated, as relevant here: "This is your Union leadership. Wtf. When elected this will stop." For her part, Little responded: "Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!"

O'Laughlin and Little were disciplined for their comments with a "written warning," per the Fire Department's Social Media Policy.  In relevant part, the Social Media Policy provides as follows:

> **Personal Use**:
>
> . . .
>
> d.  Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.  For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.
>
> . . .
>
> g.  Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselve[s] with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.
>
> . . .

i.  Failure to comply with the above guidelines may result in discipline up to and including termination. . . .

j.  Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

## B

O'Laughlin and Little sued the County, alleging that—as applied to them—the Social Media Policy unconstitutionally restricted their free-speech and free-association rights under both the First Amendment to the United States Constitution and Article I, § 4 of the Florida Constitution, and that the Policy is unconstitutionally overbroad and vague on its face.[1]  They sought an injunction prohibiting the Fire Department from enforcing the Policy and a declaration ordering it to rescind the written warnings that they had received for violating it.

The County filed a motion to dismiss, which the district court granted in part, holding that plaintiffs failed to sufficiently allege either (1) that the County violated their right to free speech, because their online comments weren't related to a "matter of

---

[1] Plaintiffs also initially asserted that the Social Media Policy constituted a prior restraint on speech, but have conceded on appeal that the district court "correctly held" that it is not.  Br. of Appellants at 12.

public concern," or (2) that the County violated their right to free association, because they didn't allege any associational conduct that the County had inhibited. The district court denied the County's motion to dismiss plaintiffs' facial claims that the Policy is unconstitutionally overbroad and vague, concluding that the Policy arguably regulates employees' right to speak on matters of public concern in a way that could prohibit most speech critical of the Fire Department.

The parties filed dueling motions for summary judgment on the overbreadth and vagueness claims. With respect to the overbreadth challenge, the district court held that "the impact of the proscriptions in the Social Media Policy is outweighed by the Fire Department's interest in [a] functioning and orderly department capable of effectively serving the public." And with respect to vagueness, the court concluded that "the policy is sufficiently clear that a reasonable person could foresee the conduct which would put him at risk of discharge or other discipline."

O'Laughlin and Little timely appealed to this Court. Before us, they argue that the district erred in rejecting their (1) as-applied free-speech claim, (2) as-applied free-association claim, (3) facial overbreadth claim, and (4) facial vagueness claim.[2]

---

[2] "We review a district court's dismissal of a complaint for failure to state a claim upon which relief may be granted de novo." *Resnick v. Avmed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012). We also review a district court's grant of

20-14676                Opinion of the Court                7

## II

## A

Plaintiffs' primary contention is that their free-speech rights were violated when they were disciplined for their Facebook posts. Although it's well-settled that a public employee may not be discharged or punished in retaliation for exercising her right to free speech under the First Amendment, it's also well-settled that a public employee's free-speech rights are not absolute. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989).

In *Pickering v. Board of Education*—the pathmarking case governing public employees' free-speech rights—the Supreme Court held that a public employee's interest in exercising her freedom of speech must be weighed against the government's need to "promot[e] the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968). Then, 15 years later in *Connick v. Myers*, the Court explained that "[t]he repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental," and, therefore, it is essential to a public employee's free-speech claim that her speech relate to a matter of public concern. 461 U.S. 138, 143 (1983).

---

summary judgment de novo, applying the same legal standard used by the district court. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).

Drawing on *Pickering* and *Connick*, we have developed the following four-step "balancing test":

> To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer [4] to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech.

*Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (internal citations omitted).

To determine whether a public employee's speech addresses a matter of public concern at step one of the four-factor *Pickering-Connick* test, a reviewing court must examine three sub-factors—namely, the "content, form, and context" of the employee's statement. *Connick*, 461 U.S. at 147–48.

The district court here held that plaintiffs' Facebook posts did not address a matter of public concern and ended its free-speech analysis there. In so holding, the court emphasized (1) that "the content of the speech addressed the potential misuse of a Union Time Pool," not the "misuse of public dollars or the Fire

Department's budgeting priorities"; (2) that the speech was not "communicated to a [sic] public at large" but, rather, was "made in the form of posts and a comment in a private Facebook group"; and (3) that the "context" suggested that plaintiffs "were motivated to speak by personal interests in electing . . . O'Laughlin to a union leadership position."

We disagree with the district court's reasoning with respect to each of the public-concern sub-factors and, thus, with its overall conclusion that plaintiffs' speech didn't address a matter of public concern.

First, *content*, which we have said is "undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1284 (11th Cir. 2006). With respect to the content sub-factor, there is no requirement in a case like this, as the district court seemed to assume, that the speech allege a "misuse of public dollars." Rather, following the Supreme Court's lead, we have held, more generally, that "[i]n assessing the content of a public employee's speech, we look to whether the speech communicates a 'subject of legitimate news interest[,] a subject of general interest and of value and concern to the public at the time.'" *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)). Here, O'Laughlin alleged—and Little seemed to second—(1) that Newsome had attempted to misuse member-donated paid-time-off for his own personal benefit and (2) that Fire Department management was complicit in Newsome's wrongdoing. Put simply, plaintiffs' speech was

intended to expose what they perceived to be corruption within the union and the Department. That strikes us as sufficiently "a subject of legitimate news interest" to satisfy the public-concern requirement's content sub-factor. Indeed, we have emphasized that "a core concern of the [F]irst [A]mendment is the protection of the 'whistle-blower' attempting to expose government corruption." *Bryson*, 888 F.2d at 1566; *see also Porter v. Califano*, 592 F.2d 770, 785 (5th Cir. 1979) ("[I]t is unthinkable that a public employee who attempts to expose corruption in her office should be punished . . . .").[3]

The district court likewise erred with respect to the public-concern requirement's *form* sub-factor. Contrary to that court's apparent assumption, the law is well-settled that a public employee does not forfeit his free-speech rights simply because he chooses to communicate privately rather than publicly. The Supreme Court's post-*Pickering* decision in *Givhan* makes that much crystal clear. In that case, a public-school teacher engaged in a series of private communications with her principal complaining about employment policies and practices that she deemed racially

---

[3] It's worth noting that this case is different from *Mitchell* in an important respect. There, the panel held that the employee's speech was "comprised solely of sophomoric name-calling and contempt-communicating expressive acts"— it was an unadorned "*ad hominem* attack[]"—and was "unaccompanied by any content touching an issue of public concern." 468 F.3d at 1285. Here, both O'Laughlin and Little used some salty language—or acronyms, as the case may be—but they did so in service (however crude) of a point about Newsome's fitness for union office.

discriminatory. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412–13 (1979). This Court's predecessor, the old Fifth Circuit, reversed a judgment in the teacher's favor on the ground that because she "had privately expressed her complaints and opinions to the principal, her expression was not protected under the First Amendment." *Id.* at 413. The Supreme Court unanimously reversed, expressly rejecting the proposition that "private expression of one's views is beyond constitutional protection." *Id.* While *Pickering* and other cases like it "each arose in the context of a public employee's public expression," that fact, the *Givhan* Court clarified, was "largely coincidental." *Id.* at 414. No decision, the Court emphasized, "support[s] the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Id.* Since *Givhan*, our own decisions have underscored the same theme. *See, e.g., Cook*, 414 F.3d at 1319 (citing *Givhan* and holding that "[t]he mere fact that [a public employee's] speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern"); *Kurtz v. Vickry*, 855 F.2d 723, 727–30 (11th Cir. 1988) (citing *Givhan* and holding that privately communicated speech sufficiently addressed a matter of public concern).

Finally, *context*. Plaintiffs here aired their grievances in the run-up to a union election, and they used an online platform to pointedly criticize union leadership. We have observed that "[i]ssues regarding the operation of government, including issues

of union organization, are often considered matters of public concern." *Cook*, 414 F.3d at 1319.   And contrary to the district court's suggestion, the fact that plaintiffs' speech here occurred in the context of a union election hardly changes matters.  While we don't doubt the district court's factual premise that plaintiffs' speech was at least to some degree "motivated" by their personal interest in the outcome of the union election, we reject its conclusion that their election-related motivation deprives their speech of its publicness.  Presumably, in any campaign setting, a candidate and his supporters will have a selfish purpose for speaking, including about rival candidates—namely, winning the election.  But far from undermining their speech's claim to First Amendment protection, that purpose at least arguably strengthens it.  *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995) (citing numerous decisions in support of the proposition that campaign-related speech exists at the very core of the First Amendment).[4]

Because we conclude that the district court erred in concluding that plaintiffs' speech didn't address a matter of public concern

---

[4] This is not a case like *Morris v. Crow*, 117 F.3d 449 (11th Cir. 1997), in which we tentatively suggested—in dicta—that a public employee's "vituperative outburst" uttered at a polling place might not have related to a matter of public concern.   There, we emphasized (1) that the employee was motivated solely by "her anger that [one of two candidates for sheriff] had fired her husband" and (2) that there was "no evidence that [her] speech at the polling place included any commentary on the relative qualifications of the candidates." *Id.* at 457.  Here, by contrast, the very point of plaintiffs' speech was to comment on Newsome's fitness to serve in union leadership.

at step one of the four-part *Pickering-Connick* balancing test, we vacate that court's rejection of plaintiffs' free-speech claim and remand for it to conduct the remainder of the *Pickering–Connick* analysis in the first instance.

## B

O'Laughlin and Little separately allege that—as-applied to them—the Social Media Policy unconstitutionally restricted their right to free association.

Although both parties refer in their briefs to the First Amendment's "Free Association Clause," the Constitution does not by its terms protect the freedom of association. Rather, association has been characterized as a right "implicit" in the First Amendment. There are two types of constitutionally protected association—intimate and expressive. Here, we deal with the right to expressive association, which the Supreme Court initially recognized in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). There, the Court held that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* at 460.

In *Roberts v. U.S. Jaycees*, the Supreme Court explained that the freedom of expressive association is instrumental to, and protective of, *other* constitutional rights: "[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment." 468 U.S. 609, 618 (1984).

"The Constitution guarantees freedom of association of this kind," the Court continued, "as an indispensable means of preserving other individual liberties." *Id.* We have specifically held that "[t]his right to freedom of association extends to public employees being able to engage in associative activity without retaliation." *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cnty.*, 809 F.2d 1546, 1558 (11th Cir. 1987).

The district court here held that plaintiffs failed to allege any "associational conduct upon which the [County] ha[d] infringed," and we agree. The Supreme Court has described the freedom of association as "the exercise of one's right to choose one's associates." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quotation omitted). O'Laughlin and Little simply weren't denied that right. Plaintiffs complain that they were unfairly disciplined for their social-media posts—that is, for their speech—*not* that they were punished for joining the union, collectively bargaining, or otherwise hanging around with people who share their beliefs. At its core, this is a speech case, not an association case. *See* Oral Argument at 8:08 *et seq.*

Accordingly, we affirm the district court's dismissal of plaintiffs' as-applied free-association claim.

## C

Next up: Plaintiffs contend that—on its face—the Fire Department's Social Media Policy is unconstitutionally overbroad. The policy is indisputably broad: It prohibits "content that could

be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public."

In determining whether a public employer's policy that prospectively restricts speech is unconstitutionally overbroad, courts apply a modified version of the *Pickering-Connick* test. That test places a heavy burden on the government to "show that the interests of [the] potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (quotation marks omitted).

The district court here acknowledged that, on its face, the Social Media Policy covers speech that could address matters of public concern. It ultimately concluded, however, that "the Fire Department's interests"—in summary, in identifying prohibited social-media-related conduct and providing related guidance; maintaining order, discipline, and camaraderie; and ensuring firefighters' ability to serve the community—"outweigh[ed] potential employee and audience interests in the speech the Social Media Policy proscribes."

We disagree. The Fourth Circuit's decision in *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016), is instructive. The court there considered a police department's social-media policy that prohibited "[n]egative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts

the public's perception of the department"—and, even more broadly, the dissemination of any information "that would tend to discredit or reflect unfavorably upon" the department. *Id.* at 404. In a suit brought by two veteran officers who had engaged in a Facebook conversation about the pitfalls of "rookie cops becoming instructors," the Fourth Circuit invalidated that policy as "unconstitutionally overbroad." *Id.* at 407. In particular, the court concluded that there could be "no doubt" that the policy prohibited protected speech, inasmuch as it "prevent[ed] plaintiffs and any other officer from making unfavorable comments on the operations and policies of the Department, arguably the 'paradigmatic' matter of public concern." *Id.* at 407–08 (quoting *Sanjour v. EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995)). And, more to the point for present purposes, the Fourth Circuit emphasized the "astonishing breadth" of the policy, which "proscribe[d] '[n]egative comments on the internal operations of the Bureau'—which could be just about anything—or on the 'specific conduct of supervisors or peers'—which, again, could be just about anything." *Id.* at 408.

The Social Media Policy here suffers from the same sort of "astonishing breadth." It expressly prohibits "disseminating content" that "could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public." In the *Liverman* court's words, that "could be just about anything." The district court here reasoned that the Social Media Policy's "For example" clause—which is found in Subsection (d) and catalogues a non-exhaustive list of

topics that might trigger the prohibition—sufficiently narrowed the provision's reach. But here, as in *Liverman*, "the milder language in a single provision does not salvage the unacceptable overbreadth of the social networking policy taken as a whole." 844 F.3d at 409.

Accordingly, we vacate the district court's summary judgment on plaintiffs' overbreadth claim and remand for further proceedings consistent with this opinion.

## D

Finally, vagueness. "In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (citing *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974)). "Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.*

The district court here concluded that the Social Media Policy "is sufficiently clear that a reasonable person could foresee the conduct which would put him at risk of discharge or other discipline." We hold that plaintiffs have failed to properly present a vagueness challenge on appeal. Although plaintiffs use the term "vagueness" once in the argument section of their opening brief, the portion of the brief in which that word appears is, in fact, devoted to contesting the policy's *overbreadth*. *See* Br. of Appellant

at 34–39 (focusing, in particular, on *Liverman*, which, as already explained, found a similar social-media policy unconstitutionally overbroad). Accordingly, plaintiffs have abandoned any vagueness argument that they might have intended to present. *See, e.g.*, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (holding that "[a] party fails to adequately 'brief' a claim when he does not 'plainly and prominently' raise it, 'for instance by devoting a discrete section of his argument to [it]'" (citations omitted)).

We affirm the district court's judgment rejecting plaintiffs' facial vagueness claim.

## III

For the foregoing reasons, we affirm the district court's judgment as to the free-association and vagueness claims but vacate and remand as to the free-speech and overbreadth claims.

**AFFIRMED** in part, and **VACATED** and **REMANDED** in part.