[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 22-10319

————————————————

ZEN GROUP, INC.,
CARLOS OTAMENDI,

Plaintiffs-Appellants,

*versus*

STATE OF FLORIDA AGENCY FOR HEALTH
CARE ADMINISTRATION,
SECRETARY, STATE OF FLORIDA, AGENCY
FOR HEALTH CARE ADMINISTRATION,
KELLY BENNETT,
individually and in her official capacity as
Chief of the Office of Medicaid Program
Integrity within the State of Florida, Agency
for Health Care Administration,
SHEVAUN HARRIS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-23218-DPG

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal involves alleged retaliation by officials of the Florida Agency for Health Care Administration against Zen Group, Inc., a Medicaid provider. Zen Group asserts that the officials made baseless referrals for investigation of fraud and suspended payments to Zen Group in retaliation for its previous exercise of its constitutional rights in an administrative proceeding. Zen Group complained that the officials' retaliation violated its due-process right under the Fourteenth Amendment and its speech and petition rights under the First Amendment. It sought both damages and injunctive relief. The district court dismissed the complaint. We hold that Zen Group's due-process and First Amendment claims for damages are both barred by qualified immunity. And Zen Group lacks standing to seek injunctive relief. So we affirm.

## I. BACKGROUND

Zen Group, Inc., is "a Florida Medicaid provider of services to developmentally-disabled minors." Carlos Otamendi is its owner. Zen Group alleges that beginning in 2018, the Florida Agency for Health Care Administration wrongfully attempted to recoup payments rendered under the Agency's "Behavior Analysis [S]ervices [P]rogram." In its final audit report, the Agency demanded more than $1.5 million from Zen Group. The Agency concluded that it had overpaid Zen Group by more than $1.3 million for services not covered under Medicaid. The Agency determined that the Zen Group employees who rendered the services at issue were not qualified or had not properly documented their qualifications. It also assessed a fine of $276,067.95 for failing to furnish proper records and filing an improper claim. *See* FLA. ADMIN. CODE r. 59G-9.070(7)(c), (e). The Agency explained that it intended to withhold payments for Medicaid services if necessary to cover the recoupment and fine. The report advised Zen Group of its right under state law to request an administrative hearing.

Zen Group filed a petition for a formal hearing to challenge the recoupment and fine. Zen Group alleged that the Agency had wrongfully issued "overpayment demands based on newly-created retroactively-applied provider qualification[] [requirements]." During the administrative proceedings, Zen Group served the Agency with a motion for sanctions. But the Agency enjoyed a 21-day safe-harbor period before the motion could be publicly docketed. *See* FLA. STAT. § 57.105(4). Within that period, the parties settled.

Under the terms of the settlement, the Agency paid Zen Group about $667,000 of the funds it had withheld.

According to Zen Group, the Agency officials—particularly Kelly Bennett, Chief of the Office of Medicaid Program Integrity—retaliated against Zen Group for its administrative challenge and for its criticism of the Agency in its motion for sanctions. The day after the Agency paid the withheld funds, Zen Group asserts, Bennett "embarked on a course of conduct to retaliate against Zen Group and to put Zen Group out of business." The Agency notified Zen Group that it was being investigated for fraud and that "general allegations [against Zen Group] include[d] billing for services not rendered." Zen Group maintains that it "did not in fact commit any fraud and [the Agency] and Defendant Bennett were aware that Zen Group did not commit any fraud." It further asserts that it provided "[d]ocumentary and testimonial evidence" to the investigator that "establishe[d] Zen Group did not commit any fraud."

Zen Group received periodic updates from the Medicaid Fraud Control Unit of the Florida Attorney General's Office, which is responsible for determining whether prosecution is warranted. *See* FLA. STAT. § 409.920(9)(d). In February 2020, the assigned investigator told Zen Group that "[e]veryone in the Chain of Command ha[d] Approved the Closing [of the investigation] for Lack of Evidence." They awaited the approval of only the Chief Assistant Attorney General. In the meantime, the Unit received two new fraud referrals from the Agency's Office of Medicaid Program Integrity. One referral related to the fraud claim that had previously been

settled. The other referral related to billings for a single patient in 2017.

During the pendency of the allegedly retaliatory investigations, "the Agency [again] suspended Medicaid payments to Zen Group." Federal regulations provide that "[t]he State Medicaid agency must suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending." 42 C.F.R. § 455.23(a)(1). Zen Group continued "providing services to Medicaid patients without receiving payment from [the Agency]." From January 10 to April 15, 2020, it allegedly "accumulate[d] over $1,000,000 in accounts receivable from the Agency." Eventually, the payment suspension took a financial toll on Zen Group. On April 15, Zen Group had to suspend its services. Zen Group alleges that it "completely ceased operations" on June 1 but "remain[ed] a Florida Medicaid provider subject to" the Agency's authority.

On July 1, an assistant attorney general emailed counsel for Zen Group requesting information "pertaining to a 'list of individuals and dates' compiled by the [Fraud Control Unit]." Zen Group alleges that the requested information "ha[d] nothing to do with any of the three fraud referrals from [the Agency] that Zen Group ha[d] been made aware of." It inferred that the Agency had made a "fourth separate referral."

On August 3, Zen Group filed a complaint in the district court against three defendants: the Agency for Health Care Administration; Mary Mayhew, Secretary of the Agency; and Kelly

Bennett, Chief of the Office of Medicaid Program Integrity. On August 21, Bennett informed Zen Group that the investigation was closed and "[t]he Agency [was] hereby discontinuing the payment suspension." Zen Group described the reversal as "far too little, far too late."

Zen Group then filed an amended complaint. It alleged that its payments should not have been suspended because there was no credible allegation of fraud. The amended complaint raised six claims, including a violation of the Fourteenth Amendment's Due Process Clause and a violation of the First Amendment's Free Speech and Petition Clauses. It sought money damages and injunctive relief for both of those claims. The district court dismissed both claims for failure to state a claim.

Zen Group appealed. After oral argument, we requested that the parties submit supplemental briefing on the question of whether Zen Group had standing to seek injunctive relief. We also invited the Attorney General of Florida to file a brief as *amicus curiae* addressing standing as well as the merits.

## II. STANDARD OF REVIEW

We review *de novo* a dismissal for failure to state a claim. *Hoever v. Marks*, 993 F.3d 1353, 1357 (11th Cir. 2021) (en banc). And we "may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*, 65 F.4th 556, 562 (11th Cir. 2023).

### III. DISCUSSION

We divide our discussion into three parts. First, we explain that Zen Group's request for damages for retaliation in violation of the Due Process Clause is barred by qualified immunity. Second, we explain that its request for damages under the First Amendment is also barred by qualified immunity. Finally, we explain that Zen Group lacks standing to seek injunctive relief.

*A. Zen Group's Request for Damages for Retaliation Under the Due Process Clause is Barred by Qualified Immunity.*

Zen Group asserts that officials violated its right to be free from retaliation after it exercised its right under the Due Process Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV, § 1. The officials allegedly retaliated—by making a "baseless fraud referral" and suspending Medicaid payments—after Zen Group exercised its due-process right by administratively challenging the Agency's recoupment demand and civil fine. The district court dismissed this claim because it concluded that Zen Group had failed to assert any due-process right *underlying* its retaliation claim: because Zen Group did not have a protected "property interest in the money the Agency paid to Zen Group [for Medicaid services]," Zen Group had no due-process right to bring an administrative challenge in the first place. And absent this due-process right, Zen Group could not state a claim that the officials had retaliated after it had exercised any constitutional right.

We disagree with the district court in part. Zen Group *did* have a predeprivation right to due process to challenge the

Agency's imposition of a civil fine. But because neither the Supreme Court nor we have held that there is a separate constitutional right to be free from *retaliation* for the exercise of a due-process right, Zen Group's claim is barred by qualified immunity.

Zen Group's petition for administrative review was an exercise of its due-process right because, at a minimum, it had a constitutional right to challenge a $276,067.95 civil fine. Zen Group sought "[a] finding that the Agency abused its discretion and acted arbitrarily in imposing a fine in the amount of $276,067.95." The Agency assessed the fine on the ground that Zen Group had committed "violation(s) of Medicaid policy [that] constitute[d] fraud or abuse" under Florida law. And the Agency assessed that fine *over and above* the value of the $1.3 million in Medicaid overpayments it sought to recoup. The assessment of the $276,067.95 fine threatened to invade a cognizable property interest distinct from the overpayments: Zen Group's money.

To be clear, we need not decide whether Zen Group had a property interest in the $1.3 million in disputed overpayments subject to recoupment. Like our concurring colleague, we recognize that other circuits have ruled that providers lack a property interest in Medicaid payments subject to recoupment or final administrative review. *See Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011); *Yorktown Med. Lab'y, Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991). But those decisions address only whether providers have a cognizable interest in *"reimbursements . . .* withheld pending a fraud investigation"—not whether an additional *fine* deprives a

provider of a property interest. *Pers. Care Prods.*, 635 F.3d at 158 (emphasis added); *see also Yorktown*, 948 F.2d at 89 (finding that providers had no property interest in "[Medicaid] payment[s] for services rendered").

Zen Group had at least a due-process right to challenge a $276,067.95 fine because the fine would deprive Zen Group of money *on top of* the recoupment of Medicaid payments for services rendered. *See* FLA. ADMIN. CODE r. 59G-9.070(7) (treating separately recoupment and the imposition of sanctions). And Zen Group's administrative hearing request represented its final opportunity to challenge the assessed fine. Because Florida had issued a Final Audit Report, only ministerial steps remained before the fine would be levied. The Final Audit Report informed Zen Group that it had 21 days to initiate an administrative hearing before any challenge was "waived" and sanctions became "conclusive and final." *See also* FLA. ADMIN. CODE r. 59G-9.070(2) (defining sanctions as "imposed" upon the filing of a Final Order with the Agency Clerk—a ministerial task—after a final audit report is issued).

Florida may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Supreme Court has recognized that "[its] precedents establish the general rule that individuals must receive notice and an opportunity to be heard *before* the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (emphasis added) (assessing whether adequate process was afforded during civil forfeiture). And our precedents establish that

a due-process right attaches to the imposition of civil or administrative penalties. We have held that "individuals whose property interests are at stake due to government actions are entitled to notice of the proceedings and an opportunity to be heard." *Mesa Valderrama v. United States*, 417 F.3d 1189, 1196 (11th Cir. 2005) (citing *Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002)) (assessing whether plaintiff was afforded due process during the administrative forfeiture of a $100,000 check); *see also Robinson v. United States*, 734 F.2d 735, 738–39 (11th Cir. 1984) (holding that the failure to timely initiate civil forfeiture proceedings was a denial of due process); *United States v. Castro*, 883 F.2d 1018, 1021 (11th Cir. 1989) (recognizing that undue delay in initiating civil forfeiture proceedings could "demonstrate[] a denial of . . . due process"). And the Supreme Court has stated "[t]he general rule" is that "a party cannot invoke the power of the state to seize a person's property without a *prior* judicial determination that the seizure is justified." *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 562 n.12 (1983) (citing *Boddie v. Connecticut*, 401 U.S. 371, 378–379 (1971)); *see James Daniel*, 510 U.S. at 53 (recognizing that due process ordinarily requires "predeprivation notice and hearing").

Although Zen Group enjoyed a due-process right to challenge the fine, whether its claim for unconstitutional *retaliation* is barred by qualified immunity is another matter. Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and internal quotation marks

omitted). To determine whether a right is clearly established, "we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted). Specifically, we determine whether "a materially similar case" has been decided, a "broader, clearly established principle . . . control[s] the novel facts of the situation," or "the conduct involved . . . so obviously violate[s] the constitution that prior case law is unnecessary." *Id.* Only holdings of "the Supreme Court, the Eleventh Circuit or the law of [the Supreme Court of Florida] . . . can 'clearly establish' constitutional rights" for purposes of qualified immunity. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009) (citation omitted).

Zen Group's right to be free from retaliation for its previous exercise of its due-process right was not clearly established. No "materially similar case" from the Supreme Court, this Circuit, or the Supreme Court of Florida has established an anti-retaliation right under the Due Process Clause. Nor does a "broader, clearly established principle . . . control the novel facts of the situation." *Gaines*, 871 F.3d at 1208. Zen Group argues that our First and Fourth Amendment retaliation precedents establish the principle that any claim for unconstitutional retaliation may be brought under section 1983. *See Leslie v. Ingram*, 786 F.2d 1533, 1537 (11th Cir. 1986), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386, 399 (1989), *as recognized in Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 n.28 (11th Cir. 2017); *see also Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *Bennett v. Hendrix*, 423 F.3d 1247, 1255–56 (11th Cir. 2005). But these precedents cabin the scope of the anti-

retaliation right to *specific* constitutional provisions—most often the First Amendment. *See Cate*, 707 F.2d at 1189 (finding that "retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment"); *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003) (finding that a claim for retaliatory prosecution sounded under the First Amendment); *Rehberg v. Paulk*, 611 F.3d 828, 847 n.18 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Leslie*, 786 F.2d at 1537 (finding that "retaliation against [the plaintiff's] assertion of his right to insist upon arrest by warrant" under the Fourth Amendment was unconstitutional). We have never recognized a general, free-floating right to be free from retaliation.

As we explained in *Ratliff v. DeKalb County*, the existence of an anti-retaliation right is specific to the *underlying* protected conduct triggering retaliation. 62 F.3d 338, 340–41 (11th Cir. 1995). In *Ratliff*, the plaintiff alleged that public officials had violated her rights under the Equal Protection Clause by retaliating because of her complaints of gender discrimination. *Id.* at 340. We reversed a denial of qualified immunity because we found that no "clearly established right exists under the *equal protection* clause to be free from retaliation." *Id.* We explained that although a claim for retaliation "may be brought under 42 U.S.C. § 1983 pursuant to the *first amendment*," that anti-retaliation right did not exist in the equal-protection context. *Id.* at 341; *see also Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause.").

Zen Group fails to identify any precedent recognizing an anti-retaliation right under the Due Process Clause. Because we have never recognized an anti-retaliation right in the due-process context, nor recognized any broadly applicable anti-retaliation principle, we cannot say that the officials' conduct violated clearly established law. Because the officials are entitled to qualified immunity, we affirm the dismissal of Zen Group's due-process claim for damages.

### B. Zen Group's Request for Damages Under the First Amendment is Barred by Qualified Immunity.

Zen Group alleges that the officials "violated [its] First Amendment rights to petition the government for redress and to free speech" by retaliating against Zen Group for defending itself against the recoupment and fine and for criticizing the Agency in its sanctions motion. *See* U.S. CONST. amends. I, XIV. As a preliminary matter, a plaintiff has a viable First Amendment retaliation claim only when speaking "as a citizen" rather than as a government employee. *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1345 (11th Cir. 2019) (citation omitted). Although Zen Group is a government contractor, the officials do not contend that Zen Group was speaking in its role as a government agent rather than as a citizen. So we need not decide whether a contractor not bound by an employment relationship is subject to different constraints in bringing a First Amendment claim.

To state a First Amendment retaliation claim, Zen Group must establish that (1) it "engaged in constitutionally protected"

speech or petition activity, (2) the officials' alleged "retaliatory conduct adversely affected that protected speech and right to petition," and (3) "a causal connection exists between the . . . retaliatory conduct and the adverse effect on [Zen Group's] speech and right to petition." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). The officials contest only the first element: whether Zen Group's speech and petition activities were constitutionally protected.

Zen Group's speech and petition activities are constitutionally protected only if they relate to a matter of public concern. As Zen Group acknowledges, the Supreme Court has held that government contractors' speech is constitutionally protected only when that speech relates to a matter of public concern. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673–77, 685 (1996). And it has held that public employees' petitions are likewise constitutionally protected only with respect to matters of public concern. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89, 393 (2011).

Zen Group argues that the public-concern test should not be further extended to *Petition* Clause claims brought by *government contractors*. But the logic of the Supreme Court's decisions easily extends to this context. The Court has explained that "[t]he similarities between government employees and government contractors with respect to [speech rights] are obvious." *Umbehr*, 518 U.S. at 673–74. And it has stated that although "Speech Clause precedents [do not] necessarily . . . resolve Petition Clause claims," "claims of retaliation by public employees do not call for [a]

divergence" in interpretation. *Guarnieri*, 564 U.S. at 388–89. In the light of the close connection between government employee and government contractor speech claims—as well as government employee speech and petition claims—it follows that the public-concern test controls the government contractors' petition claims. *See L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 808 (8th Cir. 2012) (holding that government contractors' petitions are constitutionally protected only if they involve matters of public concern).

To determine whether speech or a petition involves a matter of public concern, we "must examine three sub-factors—namely, the 'content, form, and context' of the [contractor or] employee's statement." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1051 (11th Cir. 2022) (citation omitted). Among these three, content is "undoubtedly the most important." *Id.* (citation omitted). At a high level of generality, "[t]o fall within the realm of public concern, an employee's speech must relate to any matter of political, social, or other concern to the community." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162 (11th Cir. 2015) (citation and internal quotation marks omitted). It may also qualify if it relates to "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014). The goal is to protect the employee or contractor's right, as a citizen, to speak on matters of public concern. *See O'Laughlin*, 30 F.4th at 1051.

The district court concluded that "[i]n its petition, Zen Group did not challenge the Behavior Analysis Services Program

or Agency policies generally; rather, Zen Group's petition pertained only to its individual grievance." The district court did not address the sanctions motion. We conclude that although the content of the petition for a formal hearing does not implicate a matter of public concern, the content of the motion for sanctions does.

The petition for a formal hearing relates to Zen Group's private dispute with the Agency. One sentence in the prayer for relief questions the legal validity of rules that, according to Zen Group, were improperly promulgated. Zen Group sought "[a] finding that [the Agency's] conclusions are un-promulgated rules and without any force and effect." But that sentence is hardly sufficient to transform a petition for a formal hearing that otherwise addresses only a private dispute into a petition on a matter of public concern. We need not address the form or context of the petition.

By contrast, the content of the motion for sanctions relates to a matter of public concern. In a section entitled "Agency Disarray In Interpreting And Applying Rule 59G-4.125 Leads To Prohibited Arbitrary And Capricious Agency Action," the motion characterized the approval process for behavioral assistants as "rudderless" and "ad hoc" and protested "the lack of any clear rules or standards regarding their required qualifications." It alleged that a single employee had been tasked with reviewing thousands of applications without clear guidelines. And it accused the Agency of "re-writing *post hoc* the experience qualification requirement to impose myriad requirements not included in the duly adopted Agency rules or the coverage policies incorporated therein."

Whether speech and petitions by government employees and contractors constitute matters of public concern can be difficult to discern. "[V]irtually all speech which is made in and about a public employment [or contracting] setting will have some public significance . . . ." *Ferrara v. Mills*, 781 F.2d 1508, 1515 (11th Cir. 1986). But "a public employee [or contractor] may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Id.* at 1516.

Much of our caselaw about identifying matters of public concern arises in the public-education context, and these precedents are instructive. We have explained that "speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection" but that "teachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected." *Maples v. Martin*, 858 F.2d 1546, 1552–53 (11th Cir. 1988). For example, salary levels, course assignments, syllabi, tenure decisions, course registration, job sharing, teaching methods, and evaluation criteria are not matters of public concern. *Id.* But school funding, university admissions policies and student-body sizes, adherence to federal law respecting students with disabilities, educational standards and accreditation, curriculum weaknesses, facility adequacy, faculty-to-school ratio, and the poor performance of graduates on professional licensing exams do constitute matters of public concern. *Id.* at 1553.

Although the underlying grievance in this case is particular to Zen Group, the problems described in the sanctions motion relate to the functioning of a public agency. The motion addresses whether the Agency is operating efficiently and according to law. The description of an Agency where provider approval decisions are made by a single, overburdened employee without proper guidelines more closely resembles the concerns that we have determined "affect[] the public's perception of the quality of education in a given academic system" than it does those that relate to "internal administration of the educational system." *Cf. id.* at 1552–53. And the information found in the motion would help citizens "make informed decisions about the operation of their [state] government." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (citation omitted). So, the content of the motion relates, at least in part, to a matter of public concern.

That only a portion of the motion relates to a matter of public concern is not fatal to Zen Group's claim. A document may relate to a matter of public concern even if only a fraction is devoted to that issue. *See Connick v. Myers*, 461 U.S. 138, 149 (1983). But the portion that *does* relate to a matter of public concern must be "directed to such concerns" and may not merely "touch up against matters of public concern." *Alves*, 804 F.3d at 1167. "[V]ague and sweeping references"—for example, to "the safety and well-being of students" or "an adverse impact on client care"—"without reference to specific instances" in which those issues have arisen are insufficient, particularly when coupled with "great detail" and "specific examples" regarding "personal grievances." *Id*. In the relevant

section of its motion, Zen Group cites emails, depositions, and other evidence reflecting the Agency's "[d]isarray" in a way that is not specific to Zen Group's individual grievance.

The "form" of the sanctions motion, *O'Laughlin*, 30 F.4th at 1051, also supports the conclusion that it relates to a matter of public concern. "A court may . . . consider the employee's attempt to make her concerns public," but that consideration is "not dispositive." *Alves*, 804 F.3d at 1162; *see also Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988). The Supreme Court has explained that "[p]etitions to the courts and similar bodies can . . . address matters of great public import." *Guarnieri*, 564 U.S. at 397. Zen Group's sanctions motion was intended to be a public filing; it was never published on a public docket only because the parties settled during the state-mandated grace period before publication. *See* FLA. STAT. § 57.105(4) But such speech and petitions may still be protected. *Cf. Ballou v. McElvain*, 29 F.4th 413, 431 (9th Cir. 2022) (explaining that a "state tort notice," which a party must serve before suing a local government entity in Washington, is "a form of speech protected by the Petition Clause" because those "notices are part and parcel of formal litigation proceedings"). And Zen Group's motion, if granted, would have secured more than "individual compensation." *Deremo v. Watkins*, 939 F.2d 908, 911 n.6, 912 (11th Cir. 1991). Sanctions would have included public censure, in addition to any monetary compensation to the opposing party.

Finally, the "context" of the sanctions motion, *O'Laughlin*, 30 F.4th at 1051, offers little insight. That speech is "motivated by

. . . personal interest" does not necessarily "deprive[] the[] speech of its publicness." *Id.* at 1052–53 (internal quotation marks omitted). For example, "using [a] petition [in an internal grievance procedure] to appeal the termination of [one's] employment as any employee . . . would do" does not suggest that the problem is a matter of public concern, but "using the petition . . . as a platform to publicly air [one's] concerns about [a public official's] conduct" implies that the topic is one of broader interest. *Harmon v. Dallas Cnty.*, 927 F.3d 884, 895 (5th Cir. 2019) (citation omitted). Zen Group appeared to pursue relief both to further its private interests and to air a grievance about official conduct.

Ordinarily, our next step would be to determine whether the relevant speech and petition interests outweigh the government's interests in serving the public. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (establishing the balancing test); *O'Laughlin*, 30 F.4th at 1051 (identifying the steps of the balancing test). But we need not reach this issue, because Zen Group's claim for damages is barred by qualified immunity. Zen Group's request for damages against Bennett in her personal capacity is barred because Zen Group's First Amendment rights are not clearly established. *See Gaines*, 871 F.3d at 1208.

That a government agency cannot retaliate against a contractor for exercising its First Amendment rights is clearly established. *See Umbehr*, 518 U.S. at 686. But the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152

(2018). It must be clear with respect to the facts of *this* case that Zen Group was exercising its First Amendment rights. *Cf. Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful . . . ."). "If it is unclear whether [Zen Group's] complaints were of the kind held to involve a matter of public concern, then [Bennett's] alleged actions did not violate *clearly established* First Amendment rights and [she] is entitled to qualified immunity." *Badia v. City of Miami*, 133 F.3d 1443, 1445 (11th Cir. 1998). Even when the topic of the speech is "obviously a matter of important social interest," "we must focus on what [the officials] knew" or should have known about the facts and the law. *Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996); *Gaines*, 871 F.3d at 1207.

The parties failed to identify a "materially similar case" or a "broader, clearly established principle" delineating matters of public concern that "control[s] the novel facts of the situation," and the conduct does not "so obviously violate the constitution that prior case law is unnecessary." *Gaines*, 871 F.3d at 1208 (citation omitted). A reasonable official would not necessarily have been on notice that Zen Group's motion for sanctions involved a matter of public concern.

As we acknowledged in our analysis of the merits, whether the motion for sanctions involved a matter of public concern presented a close question. We determined that the content of the motion related to a matter of public concern by analogy to caselaw

from the public-education context, where our decisions make clear that "speech [that] directly affects the public's perception of the quality of education in a given academic system" is constitutionally protected. *Maples*, 858 F.2d at 1553. We concluded that the motion for sanctions, which would have impacted the public's perception of the operation of the state Medicaid program, is likewise protected. But a reasonable official might not have anticipated that outcome. The form of the motion—a sanctions motion in an administrative action that was never publicly docketed—was also unique. We relied upon the censuring function of a sanctions motion as well as persuasive, out-of-circuit authority to conclude that the motion was public in form. *Cf. Ballou*, 29 F.4th at 431. Again, a reasonable official might not have anticipated this result. So, the alleged retaliation did not violate clearly established law. *See Badia*, 133 F.3d at 1445.

### C. Zen Group Lacks Standing to Seek Injunctive Relief.

Zen Group also seeks injunctive relief against the officials in their official capacities. It requested an injunction "directing that Defendant Bennett and the [Agency] Secretary not make any fraud referrals . . . (or issue any related Medicaid payment suspensions) without first conducting a preliminary investigation and otherwise verifying any allegations of fraud." But Zen Group lacks standing to seek this relief.

"The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *Bischoff v. Osceola Cnty.*,

222 F.3d 874, 878 (11th Cir. 2000) (alteration adopted) (citation omitted). To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[A] plaintiff must demonstrate standing for each claim and for each form of relief that is sought." *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (citation and internal quotation marks omitted). "And when plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are certainly impending." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation and internal quotation marks omitted).

Zen Group argues that it has alleged an injury in fact capable of supporting injunctive relief on two bases. It contends, first, that the original complaint alleged an ongoing violation, and second, that the amended complaint alleged a credible threat of future harm. But Zen Group cannot assert standing on either basis.

Zen Group argues that it has standing because "at the time Zen Group and Otamendi commenced this action and filed their *original* Complaint, the constitutional violations were *ongoing*." The original complaint did not request injunctive relief. Instead, it

sought a declaration that "[d]efendants must immediately terminate the illegal payment suspension." The officials then terminated the payment suspension. Zen Group amended its complaint to request injunctive relief from future harm. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (citation omitted). Because Zen Group dropped its claim for relief based on the officials' ongoing activity and asserted a new claim for prospective relief against future harm in the amended complaint, it cannot now rely on the defunct original complaint as a basis for jurisdiction. *Id*. at 1243–44 ("When [the plaintiff] amended his complaint and failed to include . . . any . . . federal claim, the basis for the district court's subject-matter jurisdiction ceased to exist . . . .").

Zen Group also asserts that it has standing to seek prospective relief because an injury is "certainly impending." *Jacobson*, 974 F.3d at 1245. In its amended complaint, Zen Group alleged that it "completely ceased operations" in June 2020. It also stated that it "remains a Florida Medicaid provider subject to the authority of Defendants Bennett and Mayhew[] and has a credible fear of further retaliatory conduct, not least in the form of another unfounded and false fraud referral to [the Fraud Unit] and another debilitating Medicaid payment suspension." In response to our request for supplemental briefing on standing, Zen Group explained that after the Agency terminated its payment suspension and before it filed the amended complaint, Zen Group resumed providing

Medicaid services. Zen Group now argues that, "[a]s a current Medicaid provider . . . subject to Agency Defendants' power to make unreviewable fraud referrals and Medicaid payment suspensions based on nothing but retaliatory animus, . . . [p]laintiffs face an imminent threat of harm redressable by" injunctive relief.

Zen Group lacks standing to pursue injunctive relief because we are constrained to rely only on the facts that it alleged in its amended complaint. Zen Group alleged that it had "completely ceased operations" in June 2020. It did not allege that it had resumed providing services to Medicaid recipients. In that context, the most that we can fairly infer from the assertion that Zen Group "remains a Florida Medicaid provider" is that Zen Group remains an active corporation authorized by the state to provide Medicaid services, even though it is not currently doing so. "[A] court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for [the plaintiff]." *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993). The allegations in the amended complaint do not support the inference that Zen Group faces anything more than a speculative risk of future injury if it resumes providing services or the officials decide to engage in retaliatory fraud referrals against an *inactive* provider with respect to services rendered in the past. *See Worthy*, 930 F.3d at 1215 ("[A] plaintiff *must allege facts* from which it appears there is a substantial likelihood that he will suffer injury in the future." (emphasis altered) (citation omitted)); *J W ex rel. Williams*, 904 F.3d at 1264 ("A party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and

immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." (emphasis omitted) (citation omitted)).

## IV. CONCLUSION

We **AFFIRM**.

22-10319          WILLIAM PRYOR, C.J., Concurring                    1

WILLIAM PRYOR, Chief Judge, Concurring:

I write separately to add a thought about the right to be free from retaliation after a person exercises his right to due process under the Fourteenth Amendment. This Court has yet to recognize an anti-retaliation right under the Due Process Clause. But our opinion today does not prevent us from one day recognizing that the government violates the Fourteenth Amendment when it retaliates against a person for invoking his right to due process.

The Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause creates procedural safeguards against state invasions of protected interests. Its fundamental promise is the opportunity to be heard; that is, the Fourteenth Amendment guarantees proceedings to "afford [persons] an opportunity to present their objections" to the deprivation of liberty or property. *Mullane v. C. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). A due-process hearing helps "secure the individual from the arbitrary exercise of the powers of government." *Hurtado v. California*, 110 U.S. 516, 527 (1884).

The opportunity to be heard means little if the government may, without consequence, punish persons for availing themselves of a hearing. The Constitution bars retaliation against individuals who exercise their First Amendment freedoms because of the "chilling effect" on protected speech and petition activity. *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) (finding that retaliatory

conduct is unconstitutional if it would "likely deter a person of ordinary firmness from the exercise of First Amendment rights"); *accord Thaddeus-X v. Blatter*, 175 F.3d 378, 394 n.9 (6th Cir. 1999) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right.") (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). That rationale of deterrence has equal force in the due-process context. Because the government is the *only* entity that can provide a due-process hearing, a person must put himself at the government's mercy to exercise his right at all.

That retaliation violates the Due Process Clause flows from the Clause itself. The Supreme Court has explained that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *see also Blackledge v. Perry*, 417 U.S. 21, 28 (1974) ("[D]ue process . . . requires that a defendant be freed of apprehension of . . . retaliatory motivation.") (citation omitted). It would be odd if that anti-retaliation principle, itself grounded in the Fourteenth Amendment, failed to guarantee the right to be heard—that "fundamental requisite of due process." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).

We should, in an appropriate case, recognize that a person has the right to be free from retaliation for invoking his right to be heard before a proposed deprivation of his property. Acknowledging that anti-retaliation right would help ensure that future due-process violations do not go unredressed.

22-10319 HULL, J., Concurring in part and Dissenting in part        1

HULL, Circuit Judge, concurring in part and dissenting in part:

I concur in the Court's opinion except for Section III.A concerning Zen Group's claim for damages for <u>unconstitutional</u> retaliation brought under the Due Process Clause. As to Section III.A, I join its judgment affirming the dismissal of Zen Group's anti-retaliation claim under the Due Process Clause. I agree that "Zen Group fails to identify any precedent recognizing an anti-retaliation right under the Due Process Clause,"[1] and the defendant officials are entitled to qualified immunity. Maj. Op. at 13.

As all know, to overcome qualified immunity, Zen Group must show: (1) the defendant violated a constitutional right and (2) that right was clearly established. I agree with the Majority's approach of ruling on only the clearly-established prong and leaving for another day the first prong as to whether a <u>constitutional</u> anti-retaliation right exists under the Due Process

---

[1] To some extent, Appellees argue that our precedent counsels otherwise. *See Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340–41 (11th Cir. 1995) (explaining that although a claim for retaliation "may be brought under 42 U.S.C. § 1983 pursuant to the *first amendment*," that anti-retaliation right did not exist in the equal-protection context); *Watkins v. Bowden*, 105 F.3d 1344, 1354–55 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause."); *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003) ("Although Wood attempts to rely on the Fourth Amendment, there is no retaliation claim under the Fourth Amendment separate and distinct from Wood's malicious prosecution and false arrest claims. Instead, the only cause of action for retaliation that arguably applies here is retaliatory prosecution in violation of the First Amendment." (footnote omitted)); *Rehberg v. Paulk*, 611 F.3d 828, 847 n.18 (11th Cir. 2010) (same), *aff'd*, 566 U.S. 356 (2012).

2    HULL, J., Concurring in part and Dissenting in part    22-10319

Clause.[2]  Maj. Op. at 10–13; Chief Judge Pryor Concurrence at 1–2.

Although unnecessary to do so, the Majority takes the first step in answering that constitutional question by addressing whether a medical provider, like Zen Group, had an underlying "constitutionally protected" property interest in a Medicaid fine imposed for fraudulent overpayments, even though the state Agency's overpayments and fine determination was only a "probable cause" determination, was not final, and was still under a fraud investigation and administrative review when Zen Group entered into a favorable settlement with no fine.  While the Majority limits its opinion to the Medicaid fine, I would bypass the entire first prong of qualified immunity altogether.  I write to set forth six good reasons why we should leave the constitutional property-interest issue as to this Medicaid fine, tied to fraudulent overpayments, for another day.[3]

---

[2] *See Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) ("Both elements of th[e qualified immunity] test must be present for an official to lose qualified immunity, and th[e] two-pronged analysis may be done in whatever order is deemed most appropriate for the case.").

[3] To be clear, I agree with the well-established constitutional principles under the Due Process Clause that: (1) Florida may not deprive any person of property without due process of law; (2) individuals must receive notice and an opportunity to be heard before the government may deprive them of property; and (3) the Due Process Clause creates fundamental safeguards against state invasions of constitutionally protected property interests. *See* Maj. Op. at 9 (citing, *inter alia*, U.S. Const. amend. XIV, § 1).  Nonetheless, to

22-10319 HULL, J., Concurring in part and Dissenting in part    3

Alternatively, because the Majority elects to decide that question, I set forth why Zen Group had no such property interest and why I dissent in part as to Section III.A. As explained in detail herein, the Agency audit made only a "probable cause" determination as to the overpayments and related fines, and in the routine administrative-review process no fine was imposed, much less finalized, levied, or paid. My six reasons equally support this conclusion as they include a review of the Majority's flawed citations and analyses and demonstrate why Zen Group had no such constitutionally protected property interest in the preliminary, "probable cause" determination of the overpayment fine involved here.

The Majority states the assessment of the fine "threatened to invade a cognizable property interest distinct from the overpayments: Zen Group's money." Maj. Op. at 8. For sure, Zen Group has a property interest in money it owns in its bank account. But what Zen Group does not have is a property interest in government Medicaid money that Zen Group is not yet legally owed by the Medicaid Agency. As discussed herein, the contractual relationship between the Medicaid Agency and Zen Group is governed by complex state and federal Medicaid statutes and regulations. Pursuant thereto, the Medicaid Agency pays up

---

invoke the Due Process Clause, the plaintiff must demonstrate it has a constitutionally protected property interest. If a plaintiff has no such property interest under the facts of a case, there is no constitutional due process right. *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972).

4    HULL, J., Concurring in part and Dissenting in part      22-10319

front, then audits for overpayments, makes a "probable cause" determination of fraudulent overpayments and 20% of those overpayments as a fine, and withholds both sums from current reimbursements. Later in an administrative-review process, a calculation is made of the amount Zen Group is actually owed. Before that calculation, this case settled without any fine. The Majority points to no source of law that entitles Zen Group to receive Medicaid's money unfettered by government audits and overpayment fines. I now turn to the Majority's cited cases.

### Majority's Cited Cases

First, the Majority's cited cases do not address whether a property right or interest existed, but involve only whether the due process afforded was adequate. The Majority summarily states: "And our precedents establish that a due-process right attaches to the imposition of civil or administrative penalties," citing our *Mesa Valderrama v. United States*, 417 F.3d 1189, 1196 (11th Cir. 2005) (citing *Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002)); *Robinson v. United States*, 734 F.2d 735, 738 (11th Cir. 1984); and *United States v. Castro*, 883 F.2d 1018, 1021 (11th Cir. 1989). Maj. Op. at 10. It also cites *United States v. James Daniel Real Property*, 510 U.S. 43, 48 (1993). *Id.* at 11. Yet, none of these cases addresses whether a cognizable property interest existed because each plaintiff patently had one.

For example, in *Mesa Valderrama*, customs officers seized a $100,000 check payable to the plaintiff and other personal property. 417 F.3d at 1192. In *Robinson*, the customs officers seized $82,603

22-10319 HULL, J., Concurring in part and Dissenting in part     5

in currency. 734 F.2d at 736. In *Castro*, the government seized two cars and a boat. 883 F.2d at 1019. In *James Daniel*, the government seized a home and a four-acre parcel. 510 U.S. at 49. The issues in these cited cases were about the adequacy of the due process afforded—not whether a cognizable property interest existed.

Second, none of the Majority's cited "precedent" addresses Medicaid overpayments and/or fines, and the Majority does not discuss how Medicaid audits and administrative reviews work. As outlined below, complex federal and state rules (statutory and regulatory): (1) govern Medicaid reimbursements, fraudulent overpayments, and related fines; (2) permit Florida's Medicaid Agency to audit providers and make a "probable cause determination" as to overpayments and fines; (3) allow the Agency to recoup overpayments and fines by withholding current payments during the fraud investigation; but (4) grant providers full administrative review and a formal hearing to challenge both the overpayment and fine determinations in the audit before they are final. *See generally* 42 U.S.C. § 1396b (setting forth, *inter alia*, requirements of state Medicaid fraud units); Fla. Stat. § 409.913 (explaining Florida's oversight of Medicaid providers and its interim recoupment authority after a "probable cause determination" and pending administrative review, and its ability to collect the money owed "upon entry of a final agency order, a judgment or order of a court of competent jurisdiction, or a stipulation of settlement"). None of the Majority's cited cases involve this federal and state labyrinth governing Medicaid.

Medicaid's Reimbursement Process

Third, two circuit courts have concluded medical providers do not have a property interest in contingent Medicaid reimbursements, overpayments, or fines, pending a fraud investigation and final administrative determination. *Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011); *Yorktown Med. Lab'y, Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991). Before reviewing these cases, some Medicaid background is necessary.

Medicaid processes over a billion claims each year, and each claim is not inspected but paid if facially valid. As in this case, the Medicaid Agency by rote pays up front and later conducts postpayment audits to detect any overpayments or errors. Federal law requires state Medicaid plans to provide for procedures of prepayment and postpayment claims review. *See* 42 U.S.C. § 1396a(a)(37)(B). In compliance with that requirement, Florida promulgated laws authorizing the Agency to audit, verify, and withhold payment for claims submitted by Medicaid providers pending a final administrative determination. *See* Fla. Stat. § 409.913.

Accordingly, if the state Agency's audit makes "a probable cause determination" that a Medicaid provider was fraudulently overpaid in the past and owes a related fine, the Agency can withhold that money *and related fine* from *current*, legitimate payments owed to the same provider. 42 C.F.R. § 455.23; Fla. St. § 409.913(27). That process is called recoupment in the Medicaid world but, practically speaking, is an interim contractual offset by

22-10319 HULL, J., Concurring in part and Dissenting in part    7

the state payor against current reimbursements due the medical-provider payee. And if the Agency pursues recoupment or an offset, the provider has extensive statutory and regulatory processes to contest the Agency's probable cause determination as to overpayments and fines. The Agency's determination of overpayments and fines is contingent and not final until that administrative-review process is complete with a Final Order, or the provider elects not to contest them.

## Second and Fifth Circuits' Decisions

Medicaid's specialized reimbursement and recoupment processes have led two sister circuits to hold that a Medicaid provider <u>does not have</u> a constitutionally protected property interest in Medicaid reimbursements that are subject to recoupment (for overpayments and/or fines) until the fraud investigation and the administrative process are complete. *See Pers. Care Prods.*, 635 F.3d at 159 ("Nothing in Texas or federal law extends <u>a property right</u> in Medicaid reimbursements to a provider that is the subject of a fraud investigation . . . . Texas regulations plainly <u>permit current reimbursements to be withheld pending investigation</u> on prior payments, noting that 'payments for *future* claims' may be withheld and stating that payment holds are 'used to withhold payments to providers that may be used subsequently <u>to offset the overpayment or penalty amount</u> when an investigation is complete.'" (alteration adopted) (emphasis added)); *Yorktown Med. Lab'y*, 948 F.2d at 89 ("[The New York State Department of Social Services ('DSS')] promulgated regulations

authorizing it to audit, verify, and withhold payment for claims submitted by Medicaid providers pending a DSS final determination.  Thus, [the plaintiff] has no property interest grounded in either the Medicaid Act or New York regulations to payment for claims pending investigation to determine illegality.").

In its property interest discussion, the Majority ignores that in these circuit cases current legitimate reimbursements were withheld to recoup or offset both prior overpayments and fines until the related fraud investigation and administrative process were completed with a Final Order; yet the circuit courts held the provider had no property interest in those current reimbursements despite their use to recoup the penalty.  It seems to me that if there is no cognizable property interest in current withheld reimbursements—a more tangible consequence—to recoup or offset a fine, then there is no property interest in the "probable-cause" fine itself before the administrative review is completed and a Final Order issues.  The Majority fails to recognize how Medicaid's contractual process works:  rote payments up front, postpayment audits that yield only a "probable cause determination," followed by a routine administrative review to sort out any overpayments and related fines, and only then a Final Order as to overpayments and related fines.[4]

---

[4] As aptly observed by the Firth Circuit in *Personal Care Products*, "[p]roperty interests 'are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules and understandings that stem

22-10319 HULL, J., Concurring in part and Dissenting in part    9

### Medicaid Process as to Zen Group

Fourth, this case involved the same Medicaid process of audits, recoupment, and administrative review as that before our sister circuits. Here, on February 14, 2019, the Agency issued its "Final Audit Report," which notified Zen Group that: (1) "[t]he Final Audit Report constitutes a <u>probable cause determination</u> by the Agency that you were overpaid by the Medicaid program"; (2) "you were overpaid $1,367,839.74 for services that in whole or in part are not covered by Medicaid"; (3) $495 is owed for the audit cost; and (4) the Agency has assessed a "fine of $273,567.95" <u>representing 20% of the overpayment amount</u> and $2,500.00 for failure to furnish Medicaid records related to overpayments. Fla. Admin. Code r. 59G-9.070(4)(a), (7) (prescribing 20% of the overpayment amount as a fine for a first offense and a $2,500 fine for a first records violation).[5]

In addition to instructing Zen Group to remit these amounts, the Report notified Zen Group that the Agency may collect money owed (1) pursuant to Fla. Stat. § 409.913(25)(d) by

from an independent source such as state law rules'. . . ." 635 F.3d at 158 (quoting *Bd. of Regents*, 408 U.S. at 577). How Medicaid works, under federal and state law, impacts the existence of a constitutionally protected property interest. No doubt at the conclusion of Florida's Medicaid administrative process, a fine imposed <u>in a Final Order</u> would be a wholly different matter than what we have in this case.

[5] These two separate amounts total the $276,067.95 fine referenced in the Majority Opinion. For simplicity, I also refer to them as the fine but, as shown above, both are directly tied to the overpayments.

10  HULL, J., Concurring in part and Dissenting in part      22-10319

exercising the option to collect money from Medicare that is payable to the provider and (2) pursuant to Fla. Stat. § 409.913(27) by withholding Medicaid reimbursements to the provider during the pendency of an administrative hearing.

The Report also clarified that "all information obtained pursuant to this [audit] review is confidential" until the Agency "takes final agency action" and "requires repayment of any overpayment or imposes an administrative sanction [the fine] by Final Order." The Report advised that Zen Group had twenty-one days to file a petition and initiate an administrative challenge before the sanctions became "conclusive and final." In fact, Florida law provides that the Agency's notice in this Final Audit Report about the application of sanctions "shall be the point of entry for administrative proceedings." Fla. Admin. Code r. 59G-9.070(2).

On March 7, 2019 (twenty-one days after the Report), Zen Group filed a Petition for a formal administrative hearing to challenge the Agency's probable cause determination of $1,367,839.74 in overpayments and the related fine.[6]

As the above history well demonstrates, the Majority is flatly wrong when it represents to the reader: "Because Florida had issued a Final Audit Report, only ministerial steps remained before the fine would be levied." Maj. Op. at 9. The Final Audit Report is

---

[6] During the pendency of the administrative proceedings, and as authorized by federal and state law, the Agency withheld payments of over $737,000 to Zen Group for services rendered to Medicaid patients by Zen Group unrelated to the Agency's claims in the Report.

22-10319 HULL, J., Concurring in part and Dissenting in part     11

only a "probable cause determination," an initial step in the fraud investigation, and the Report basically gives notice of the audit's "probable cause determination" as a point of entry to the administrative process, a formal hearing, and a later Final Order, which may or may not impose a fine.

What happened here proves my point. During those administrative proceedings, Zen Group served its own sanctions motion on the Agency. Settlement then stopped both Zen Group's Petition and the Agency's interim recoupment efforts. The Agency paid Zen Group back about $667,000 of the $737,000 in withheld reimbursements, and no fine was imposed. Indeed, the fulsome administrative process led to a favorable settlement for Zen Group. It makes perfect sense that the Agency conducts an audit and advises the provider of its probable cause determinations as to overpayments and fines, and then the provider can challenge them, and nothing is finished, or close to it, until a "Final Order." This again illustrates why there is no need to decide the property-interest issue here. However, given the Majority elects to decide the issue, this further shows that Zen Group had no property interest in the audit's probable cause fine determination under the facts and procedural history here. No fine was imposed, much less finalized, levied, or paid.

### District Court's Order

Fifth, and also contrary to the Majority's assertion, the district court did not rule that "Zen Group had no due-process right to bring an administrative challenge in the first place." Maj. Op. at

12   HULL, J., Concurring in part and Dissenting in part      22-10319

7.   Rather, following the lead of, and citing, our sister circuits, the district court ruled Zen Group had failed to demonstrate a constitutionally protected property interest in Medicaid reimbursement payments, reasoning:

> Florida state law permits the Agency to withhold Medicaid reimbursement payments from Zen Group, a provider, if the Agency makes <u>a probable cause determination that overpayment</u> occurred. *See* § 409.913(27)(a), Fla. Stat.   Federal regulations also require that the Agency suspend payments to Zen Group during the fraud investigation if there is a credible allegation of fraud unless there is good cause to continue payments. *See* 42 C.F.R. § 455.23(a)(1). Because Zen Group's reimbursement payments are contingent on payment determinations by the Agency, as prescribed by state and federal rules, Plaintiffs do not have a property interest in the payments.

Dist. Ct. Order at 10 (emphasis added).   The district court concluded "[b]ecause plaintiffs have not alleged a constitutionally protected property interest, plaintiffs have not stated a § 1983 claim for Fourteenth Amendment violations." Dist. Ct. Order at 11.  The district court never indicated Zen Group did not have a due process right to bring an administrative challenge, which Zen Group did successfully.

22-10319 HULL, J., Concurring in part and Dissenting in part     13

Tellingly too, the district court's order addressed <u>only</u> fraudulent overpayments and current reimbursements and did not mention the fraud fine. Fortunately, the Majority does not address whether Zen Group had a property interest in fraudulent overpayments or the withheld current payments to recoup or offset them. Unfortunately, the Majority does address the "probable cause" determination of a fine, despite it being unnecessary to do so and despite the Agency's withdrawal of any fine during the administrative proceedings. I do not suggest the fine issue was waived. But the fact that we have no district court ruling on it is yet another reason for my reluctance to address it in the first instance.

### Final Observation

A sixth and final observation about the Majority's conclusion that Zen Group had a civil due process right "to challenge the Agency's imposition of a civil fine." Maj. Op. at 8. It glides over the threshold requirement of a <u>constitutionally protected</u> property interest to state a <u>constitutional</u> Due Process claim. It emphasizes the $276,067.95 fine is "*over and above* the value of the $1.3 million in Medicaid overpayments" and severs the fine from the fraudulent overpayments, although the fine was tied to them. Maj. Op. at 8 (emphasis in original). It ignores the administrative process and that the fine was never final nor close to it. And its cited precedent does not address whether a cognizable, constitutionally protected property interest exists,

14  HULL, J., Concurring in part and Dissenting in part      22-10319

which is necessary to trigger a due process right.  Above I already demonstrated that.  Here is yet another example.

The majority's text quotes footnote 12 from the Supreme Court's decision in *United States v. $8,850 in U. S. Currency*, 461 U.S. 555, 562 n.12 (1983) (citing *Boddie v. Connecticut*, 401 U.S. 371, 378–379 (1971)), but that case also did not address whether a constitutionally protected property interest existed because federal Customs officials seized $8,850 in cash and plaintiff patently had one.

I recognize the Majority cites *$8,850 in U.S. Currency* mainly for this proposition: "And the Supreme Court has stated '[t]he general rule' is that 'a party cannot invoke the power of the state to seize a person's property without a *prior* judicial determination that the seizure is justified.'"  Maj. Op. at 10 (emphasis in original). But the next sentences in that same footnote 12 state (1) "an extraordinary situation exists when the government seizes items subject to forfeiture" and (2) "*Pearson Yacht* clearly indicates that due process does not require federal Customs officials to conduct a hearing before seizing items subject to forfeiture."  *$8,850 in U.S. Currency*, 461 U.S. at 562 n.12 (citing *Colero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974)).  My only point is this cited precedent also has nothing to do with cognizable property interests, much less Medicaid fines still under administrative review in connection with a fraud audit and investigation.  What we are left with is an *ipse dixit* decree that a Medicaid fine, no

22-10319  Hull, J., Concurring in part and Dissenting in part    15

matter the facts, context, or finality, is a cognizable, constitutionally protected property interest.

### Conclusion as to Section III.A

In my view, the threshold constitutional property-interest question here is not as simplistic as the Majority treats it and, like the alleged constitutional anti-retaliation claim based on the Due Process Clause, should be deferred until another day.

Alternatively, because the Majority elects to decide that question, I have set forth why I conclude Zen Group had no constitutionally protected property interest in the Final Audit Report's "probable cause" determination as to the overpayment fine that was subject to the routine administrative process and was never imposed, much less finalized, levied, or paid.  Thus, as to Section III.A, I join the judgment affirming the dismissal of Zen Group's anti-retaliation claim under the Due Process Clause, but I respectfully dissent from the Majority's ruling that Zen Group had a constitutionally protected property interest in the overpayment fine under the facts and circumstances of the case.